Our third case for this morning is Paldo Sign and Display Company v. Wagener Equities. Mr. Cohen. May it please the Court. My name is Dan Cohen. I represent the appellant, Paldo Sign and Display Company. We've raised two issues in this appeal from an adverse judgment in a Telephone Consumer Protection Act or TCPA case. Would you like to address the effect of our opinion in Bridgeview Healthcare v. Clark on the jury instruction issue here? I think maybe that would be helpful. I would and I appreciate that. We have filed a letter of supplemental authority under Rule 28 notifying this Court and this panel of the... I haven't gotten it yet. I mean, I have Bridgeview right here and I was going to ask you the same question. And what we did, we brought the Bridgeview decision to the attention of the Court. We pointed out that prior to the Bridgeview panel decision, the circuits that had considered the issue and the FCC were in alignment that common law principles of agency would not govern, limit, or be the touchstone for TCPA sender liability and that the Bridgeview panel decision seemed to be inconsistent or irreconcilable with that other circuit court and FCC authority. But I think what the Bridgeview panel was saying, I guess it was resisting the idea that this is a binary choice. Either common law agency governs 100% or it's utterly irrelevant. And it said neither one of those is true. But instead, certainly if common law agency is satisfied, then you have something that you can easily work with. And then there are broader definitions, independent contractors, for example, who are not necessarily common law agents. So you could go beyond it, but they reject the idea that agency law has nothing to do with what we're talking about. And they also reject, and I believe this is consistent with what some other courts have said, the notion that there's strict liability, that there would be liability for a company whose goods were advertised by a blast factory if the company had no idea that the sender was sending these faxes out. Well, I perceive two different points you've made, and I want to address them both. The first, I don't want to presume to speak for the subjective intent of the members of the panel in Bridgeview, but I'm constrained to the words and the opinion. Like we hope that agency rules are properly applied to determine whether an action is done on behalf of a principal? Yes. And then proceeding to analyze the plaintiff's evidence through the lens of three different types of recognized common law agency, finding plaintiff did not meet any of those three standards, and finding, therefore, that the trial court was justified in reaching its ruling. There was no discussion of some possible broader elements or broader ways under which a TCPA plaintiff could prevail. And so to the extent Your Honor suggested that there's a middle ground in the Bridgeview decision, I did not see that in its text. Well, in the application to the independent contractors, I mean, I have this in front of me as well. It's the same company. It's this B2B company. So I'm curious how you avoid the strict liability. You've got psyllium charybdis, right? How you avoid the strict liability outcome? Well... Because the one thing that is clear from the facts of Bridgeview is that Mr. Clark seems to have authorized the fax ads within the 20 miles around Terre Haute, but not the rest of them that were beyond that. So he's held liable for the ones that he authorized, but not the others. And one of the positions taken in the Bridgeview case was that a principal is liable to third parties who were innocent and were harmed by the principal's agent, even when the agent did so in violation of specific or secret instructions provided by the principal. The Seventh Circuit law, that's U.S. Supreme Court law, that if you're a principal and you hire an agent to do something and you give specific instructions, including limiting instructions, and your agent deviates from or violates those instructions and innocent third parties are harmed, you as the principal may have rights of indemnification or contribution from your agent, but you as the principal are nevertheless liable to the innocent harmed third parties. But of course this case has a different wrinkle altogether, because there's a whole question about whether Mr. Wagner and the company were even engaging B2B or whoever, whichever entity it was. And I find it particularly telling that the jury seems to accept his testimony that he wanted to look at the list. Well, maybe he wants to look at the list for purposes of compliance with the statute. Maybe he wants to see who on the list he has, the kind of preexisting relationship that the statute says is okay. I mean, there are all kinds of things, but he wants to review the list, and the jury makes findings that don't favor you on that. Well, there was no evidence in the record at the trial that he wanted to review the list to find out or confirm it would have established business relationships. I understand that, but there was testimony that he wanted to review the list and he wanted to review the final copy. That is correct. And the jury apparently buys that. Under the court's instruction as to what our standard of proof would be. Did you sue or could you have sued the fax sender? The broadcaster you mean? Yeah. Under the governing FCC regulations, you can hold the fax broadcaster liable only where you can demonstrate a high degree of involvement. And then the FCC has given some indications of what... If the fax broadcaster makes the decision to send out the faxes without the approval of his client, wouldn't that satisfy the FCC standard? FCC, it might, but you would never know that until you... Pardon? You would never know that because you're always going to be going by what the FCC has said, which is that the liable sender is either the party whose goods or services are advertised in the fax and or the party on whose behalf the faxes were broadcast. But the first part that you articulated, even if it's in a regulation, which I believe it is, seems to me to be a strict liability standard. I could cruise around the Internet this afternoon and find a company that's offering a product that I like. Maybe they make very clever cat toys. And I think, gee, I really like this company. Maybe I'll just send around a whole bunch of faxes to people saying, buy cat-happy toys. And the company doesn't know that I've done that, but I refer to it. Maybe I photocopy a picture of some of the toys. It's clearly their goods or services. Are you saying that they're liable for what I decided to do? No. Then why not? I believe the distinction is that in the scenario you just described, the party whose goods or services are advertised did nothing. They took no action. But it doesn't say that in the regulation. It just says the party whose goods or services are advertised. You're adding the end did nothing to that. The reason I'm adding that is because to allow liability in a situation where the party defendant did nothing, had no involvement. I don't understand why you didn't sue the fax broadcaster as well as the company whose product was being advertised. Number one, again, you don't know what the level of involvement of a fax broadcaster would be in the initial instance until you hear a defendant come in and try to exalt himself. Well, there is evidence, isn't there, that the fax broadcaster just didn't wait for final approval and went ahead? Wouldn't that create liability on his part? There were two streams of evidence. There's all the documentary evidence. Just answer my question. Wouldn't that make him liable for violating the act? If you believe the defendant and you believe that… Not an if. I'm asking you. Look, it's similar to what Chief Judge Wood just said. If the fax broadcaster decides to send out the faxes without the approval of his client, can't you, the class action plaintiffs, can't they sue the fax broadcaster? Probably could. Why do you say probably? Because the FCC, the regulation speaking to what constitutes a high degree of involvement. How about being sensible about it? You have someone who floods the country with unauthorized faxes. Isn't that a violation of the act? No, the FCC has not said that the broadcaster doing this… You're talking about the FCC. They define, through their implementing rules and regulations, they define the standard by which the liability is going to attach. And if I may, circling back to what I think may have been the most focused question on what are challenges to the court's instruction given. We don't believe it's strict liability where if your goods are involved, your services are advertised, you're liable no matter what, even if you had nothing to do with it. The question is, what is the standard? And we believe the court's use of an authorized, which it defined in the language of common law and implied and express agency, was exactly what the FCC in its Saris letter said is not right. It's what the 11th Circuit in Saris said is not right. And we would propose that the appropriate balance between strict liability, which would deprive defendant parties of due process, and the liability that serves the remedial purpose of the statute would be a but-for. How does strict liability deprive a person of due process? In the court's hypothesis or hypothetical of a scenario in which the party advertised in the facts had nothing to do with it. They didn't know about it. They didn't deal with the broadcaster. Somebody friendly or nefarious, malicious, attempted to fax these things and make it look like it was theirs. And under a federal statute, this completely innocent defendant is going to be held liable to the tune of millions of dollars. I think they would have a very good argument that that deprived them of procedural, if not substantive, due process. Why didn't Abraham testify? She did. By just a deposition? She's across the country. She was not traveling for anybody. We went to New York to get her testimony. You know, if we assume for the sake of argument that the district court erred in allowing the diploma mill testimony, why would that error not be harmless under Federal Rule of Civil Procedure 61? In other words, how were your substantial rights affected by that alleged error? Because the evidence that Judge Posner pointed to that supposedly could have allowed the jury to find in favor of the defendant all depended on the jury believing the defendant's statement that he had private oral telephone communications with an agent of B2B, an agent of Carolyn Abraham named Kevin Wilson, that they had a special side agreement that's not reflected in any of B2B's documents. So you've got the documents which prove the case against the defendant. You've got the defendant making a claim of oral communications that are otherwise unverified and unsupported, and it becomes an issue, are you going to believe the defendant or are you going to believe the legitimacy of the B2B documents? And that was the focal, fulcrum credibility issue in this case. And if that evidence should not have come in about the diploma mill, which destroyed not only Carolyn Abraham's credibility, B2B's credibility, but Kevin Wilson, an agent of B2B that had nothing to do with the diploma mill and provided the basis for defense counsel to stand up in closing. Now, you're saying that Abraham, her testimony shouldn't have been allowed in? Her testimony, the testimony elicited by defense counsel about the fact that three or more years before... Yeah, I understand. And what's wrong with that? I don't get it. It's prior bad acts to prove character, to prove action in conformity with character. Now, how is this presented to the jury? Did someone read her deposition testimony? My recollection is that her testimony was read. Pardon? My recollection is her testimony was read to the jury, yes. Which party placed... Why wasn't the jury given a transcript of it? I can't answer that. We read it as if it was live testimony. Well, that's a mistake because this isn't the witness. Which party placed... When you have a deposition testimony read out loud at a trial by a lawyer or someone else, you're not giving the jury a good sense of what... Because this is not the witness, this is not the person. So you think that the jury should be allowed to read the testimony and see what way to give to this diploma mill stuff. Well, I'm not sure I understand the link between whether they should be able to read it or have it read to them. Well, there's a big difference between reading something and having something read to you. I appreciated that distinction. I don't see how that correlates to, and they should be able to read the diploma mill testimony. They should only be able to read it if it was properly admitted. That's a separate question. The question is the way in which the absent witness testimony is given to a jury. Twenty-five years, I've never given the jury the transcript. I've never seen it done where the jury's given the transcript to peruse over themselves. I've seen a videotape played. I've seen us put a witness in the stand to read, as we did here, a person to stand in lieu of the witness. I've even seen juries told they cannot have the testimony during deliberations when they say, we'd like to see that deposition again. I don't understand. They're given thousands of documents maybe, but they're not allowed to have a transcript of a witness's testimony? Some of the cases addressing that issue... I mean, what if they've forgotten the testimony? Some of the cases addressing that... Does that make sense? Only through the lens of what the courts that have addressed it and held that have said, and they've said that giving them one piece of one witness's testimony to read again unduly emphasizes that testimony over the rest of the witnesses in the trial, so they have to be governed by their recollection as to all witnesses live and deposition. Which party placed her other testimony into evidence? We designated for presentation in our case in chief testimony from her, and the defense counter-designated. That opened the door. If it was admissible, then it opened the door. If it wasn't admissible, then it didn't open the door, and we contend it's not admissible. Was there some response to the diploma mill? I mean, on its face, it's not that disastrous. This was a diploma mill selling diplomas to people based on work experience and life experience as opposed to classes. One of the wives of my brother-in-law got a degree based on work experience and life experience, and that was considered to be not the same distinction as a degree from Harvard College or something, but it was considered to be reputable. The interesting thing about the observation? Wouldn't it have been helpful to have someone explain something about these work experience, life experience diplomas to see? Judge, what's significant about what you just said is that Judge Tharp made the exact opposite observation. The reason he felt this diploma mill should come in is because she used the word mill, and he said that almost automatically means she's acknowledging it was a fraud. So while I appreciate the fact you didn't say a mill. But that's incorrect, right? That's incorrect. So why wasn't there rebuttal testimony? My practice is not to double down on what I believe to be the prejudicial effect of a piece of testimony. I understand. All right. Thank you very much, Mr. Carter. Mr. Heist. May it please the Court, Robert Heist on behalf of Wagner Equities, Inc. and Daniel Wagner, appellee. Your Honors, plaintiff had the opportunity to call at trial, live, in person, to support their case or to respond to credibility issues arising out of her testimony. They made a choice not to call her. Plaintiff had the opportunity to call Kevin Wilson, also known as Connor Melville, as a witness in their case to refute the testimony, live testimony, of Daniel Wagner. Plaintiff chose not to do that. There were ample opportunities for plaintiff to address these issues, and they chose not to do it. And Judge Tharp was very considerate with respect to the diploma mill testimony as well as in comparison to other credibility attacking testimony that we wanted admitted. Well, now, wait a minute, though. Mr. Cohen said that Ms. Abraham did not live in the state or within the 100-mile bulge. So why under Rule 45 are you saying that there was an opportunity to subpoena her for the trial if she wasn't willing to come? Well, if she wasn't willing to come is a different story. Well, he said she wasn't willing to come. Okay, I understand he said that. And that's the circumstance that allows you then to go to the other rules, 3032, et cetera, and read the deposition in because she's unavailable for trial. I don't disagree. It's just inconsistent with what you said. It sounds like that was what was happening here. I think that I know for a fact that Plaintiff's counsel knew where Carolyn Abraham was. It's not that they didn't know, but suppose, I mean, it's just a civil lawsuit. You know, she says, I don't feel like coming to Chicago or wherever, Chicago, for your trial. I agree. If she didn't want to come. She's not available, which is why Rule 32 kicks in. And so we kicked in, and the deposition transcript was ferreted out in terms of what testimony was admissible, what testimony was not admissible, and so forth. And my point is Judge Tharp was very, very considered in excluding some very specific testimony and allowing some specific testimony. The diploma mill testimony, he made a very well-reasoned conclusion that that testimony was very specific to her credibility, and based on that, he allowed that in. But he's wrong about that. I respectfully disagree. Because if the diploma is based on work experience and life experience, it's not necessarily phony. It's not as good as a, you know, regular college degree. But there are these degrees, and they have some validity. They're not necessarily frauds. And I think that's the opportunity where plaintiff's counsel could have brought that out in deposition testimony in advance. Could have brought that out. And she herself uses, I mean, I think the word mill is a pejorative word. I'm not sure you would call it a diploma mill if it was one of these more legitimate places that Judge Posner is talking about. And that was a phrase that came out of Ms. Abraham's mouth. Absolutely, Your Honor. And I think Judge Tharp relied heavily on that, and in doing so, allowed that testimony to come in. Even if, for some reason, there's some indication that that was an error, I think the point was made earlier that it's a harmless error because it's 11 lines of deposition transcript. How long was this trial? This was two full days, and there was not much time devoted to this diploma mill issue. Although it was highlighted in your closing argument. Without objection, that is absolutely correct, Your Honor. But there is no objection. That's correct, Your Honor. Could we move to the jury instruction? What the jury instruction seems to do is equate the idea of authorization to the idea of being on behalf of someone. And I'm not sure that's a good link. So here's the example I thought of. I might, on behalf of my four-year-old granddaughter, buy tickets to the Denver Zoo, and she wouldn't be authorizing me to do it or anything. It would just be me going out there buying tickets on her behalf to go to the zoo. I might not even be going. Maybe it would be her mother who would take her. So why does authorize pick up everything that on behalf of means? There has to be some link to the statutory language of on behalf of to some sort of consent, some sort of agreement. What do you think on behalf of? If you had to stand here right now and define what does on behalf of mean? With the understanding and cooperation and agreement of. Why not just mean for the benefit of, to further the interests of? Because it goes right to your example that I, as a third-party sender, may think it's to somebody else's benefit for me to send out 20,000 faxes advertising cats, and the actual owner or business owner has no idea that I'm doing it. So it's too subjective for me to make that determination of what I think might be in their best interest. So they're entitled to articulate, assuming they're rational adults, their own best interest. Absolutely, Your Honor. And I think in this case, if you look at the Bridgeview opinion, which I think is very well reasoned and points out three avenues. Why didn't he say direct rather than authorized? I think direct would be too stringent. I don't understand that. That's what you do. You hire a fax broadcaster and you direct him. He tells you, I'm going to send it to 100,000 people or something like that. You say, yeah, send it. I'm directing you. I would agree. That's authorized. Kind of loose. I authorized it. But, of course, I said, OK, we'll do it. But I didn't set the time, the date, what happened. I haven't directed you to do it yet. That would be the problem. I agree with you. Let's make that the standard, that the plaintiff has to prove that the non-sender directed the sender. I agree. Let's do that. And if you do that here, clearly the evidence did not support that kind of communication in this case. So what you're actually saying, I'm not sure that I'd use the word clearly, but your position has to be that there was at least enough evidence before the jury, that the jury rationally could decide that. Correct, Your Honor. What Judge Tharp did, and I think what the Bridgeview Court did, is they found a balance by finding three avenues with respect to the express actual authority, the implied actual authority, and the apparent authority. And the least stringent of those standards was the apparent authority. And that's what the authorization component does. Who does it have to be apparent to, though? The outside world, or does it have to be apparent? I mean, I always thought that, to be honest. Somebody goes out and supposedly does something on my behalf, and if they're the person that I've hired to be my personal factotum, then even if they go beyond the scope of what I've said, everybody says, oh, but X always works for Diane. She can do this, too. So that's the outside world. The Bridgeview opinion says the principal must speak right or otherwise act toward a third party, must make the third party reasonably believe that the principal, I should say, has consented to an action done. And then they say Clark didn't do anything to create an appearance that B to B had authority to send these faxes. So I don't know if that ties all the threads together. Well, I think you're right on in the sense that it is a very subjective argument that B to B could say we thought. But the Bridgeview court says, no, you have to have some factual support for that thinking that you had authority. And that's where you have to look at the specific facts of the case. And in that case, they clearly recognized there was a 20-mile radius where there was a clear direction or authorization, but outside of that, there was not. In this case, if you apply that least stringent standard, look at the facts. Daniel Wagner testified in person in front of the jury, subject to cross-examination, that he expected to receive the list for the very purpose that Your Honor identified. He wanted to make sure that that list was going to people that he did business with because maybe he had a relationship with them or to make sure that it was limited to the people that were in the type of business that he was providing. He also wanted approval, expressly said, I want approval of the ad. B to B's marketing materials say, we won't send until you approve the ad. So there was no... There is this messiness about the check going to him, too, with these instructions, right? Agreed. And that was presented to the jury, and it was very clearly articulated and explained that as soon as Mr. Wagner found out that B to B sent this fax to 20,000, they canceled the check. Because his understanding was, I have to send the check in order to see the list. He said, I want to see the list. I want to see the ad. I want to approve the ad. Here's my check. Hold it until we do all these things. And they didn't do it. They got the check, and they sent it out to 20,000 people. Your Honor, our position is very clear, and I think the timeliness of the Bridgeview opinion supports our case exactly. That even if you apply the least stringent approach to a parent's authority, the facts in this case don't give that authority to B to B. There were three conditions that Dan Wagner expected to be met before anything was sent out. That is, review the list, see the ad, create the ad, and approve the ad. None of that was done. They got the check. They distributed it to 20,000 people. So you have to be saying that this is the equivalent of my cat hypothetical. They just sort of went off and did it because they hadn't gotten the approval. It is exactly that, Your Honor. And as soon as they realized it, the action they took demonstrates that they were not authorizing this. They stopped payment on the check immediately and never paid and then could never hear from B to B again. After numerous attempts to contact them to find out what was going on, they were gone. And for that reason, Your Honors, we would ask that you uphold Judge Starb's decision in this case. Thank you. All right, thank you. Your time ran out, Mr. Cohn, but I'll give you one final minute if you need it. I had asked you, and now I didn't quite understand your answer, why you didn't present evidence that this wasn't really a diploma mill in the pejorative sense. Because just as Your Honor sees it in a potentially harmless or innocent way, a valid way, Judge Starb saw it the other way, and I would envision that other jurors might see it that way. Yes, of course. That's why you need contrary evidence. You have to explain. It's not to use the term diploma mill, but actually if the degree is based on life experiences and so on, it's legitimate. It's not as prestigious as a regular degree, but it's not a phony, which is what the term diploma mill suggests. You could easily have gotten evidence of that. It seems to me a critical oversight. Judge, we view that as prejudicial evidence. We view trying to join that issue. I know, and if you're facing prejudicial evidence, you ought to try to pull the sting of it. You can object, and the judge says, no, I'm going to let it in. You say, well, all right, we need an opportunity to rebut. You don't lose anything by going that route. I appreciate the strategic consideration you're providing about how to handle it if it was going to come in, but that wouldn't change the analysis of whether that evidence was admissible and should have come in anyway. The fact that there is a way to better handle it. It might have changed the verdict. I'd like to think not, but I understand what Your Honor is saying. So I'll let you, did you have another point or two? Very quickly, Judge. The question we raise on the first issue is what is the correct standard, and we don't believe the trial court's formulation of authorization defined as it was by reference to common law agency principles captures the full scope of potential sender liability under the TCPA. And what we are suggesting is the appropriate instruction, number one, is exactly from the language of the regulation, on behalf of. And we let the jury decide what that means. And I would draw the court's attention to Judge Posner's decision in U.S. v. Hatfield. If you can do something on behalf of someone without that person's consent, you may think you're doing it on behalf and helping the person, but actually it's unauthorized and the person gets angry with you, right? And I think that would raise one of those situations about due process if somebody had no involvement whatsoever. That's why the standard we propose is a but-for causation standard. If this injury and harm would not have occurred but for the defendant's involvement and interaction and communications and relationship with the fax broadcaster, then the defendant is responsible as the sender. And that goes a long way towards what the defense said multiple times in their brief, is you've got to look at the relationship. You've got to look at the interaction and the involvement between the two. What if the client says, yeah, I want to send out 20,000 faxes, but I don't want you to do it until I sign off. I'm not 100 percent. Okay? Then you wouldn't say that that was authorization, would you? I wouldn't say it was authorization. I would say it meets the but-for causation standard because but-for sitting down with that broadcaster and drafting up the content of that ad. No, no, but-for. No, no, you can't do that. That's like saying but-for Columbus discovery in America. You know, New York would be half its size. You can't do that. What is but-for causation that way? I believe Your Honor has acknowledged in U.S. v. Hatfield where but-for causation goes and that sometimes it can be strained to the ridiculous, but that's not how the court considers the issue in deciding upon the proper standard and that, in fact, when you have a simple statutory language and instead the trial court tries to add a lot of definitions explaining what lay people can understand, it only confuses more. All right. Thank you very much, Mr. Cohen. Thank you. Thanks to both counsel. We'll take the case under advisory.